UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,      :
      :
          Plaintiff,     :
      :    **MEMORANDUM AND ORDER**
   -against       :    00-CV-7073 (DLI) (VVP)
      :
UNITED STATES CURRENCY IN THE  :
AMOUNT OF FIVE HUNDRED NINETY- :
EIGHT THOUSAND EIGHT HUNDRED  :
TWENTY SIX DOLLARS ($598,826.00)  :
MORE OR LESS, AND ALL PROCEEDS  :
TRACEABLE THERETO,     :
      :
          Defendant.   :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff United States of America ("government" or "plaintiff"), brought this *in rem* proceeding against funds totaling five hundred ninety eight thousand eight hundred twenty-six dollars ($598,826) ("defendant funds"). Edison Cardona ("claimant" or "Cardona") seeks return of a portion of defendant funds in the amount of five hundred eighteen thousand eight hundred and twenty-six dollars ($518,826). In this motion, the government requests that the court strike Cardona's claim pursuant to Fed. R. Civ. P. 12(f) because Cardona does not have standing to assert the claim, having suffered no injury-in-fact from the seizure of defendant funds. In the alternative, the government requests that the court grant it summary judgment because no issues of material fact exist with respect to whether the defendant funds are substantiality connected to illegal activity. Cardona, for his part, asserts that the defendant funds belong to him, that he was aggrieved by their seizure, that certain evidence obtained during the government's search of his person and his home be suppressed and that there are no grounds for forfeiture because defendant funds are not

substantiality connected to an illegal activity. Cardona asserts that, at the very least, there are material issues of fact related to the ownership and origin of a portion of defendant funds and summary judgment therefore is inappropriate. For the reasons set forth below, plaintiff's motion to strike the claim is denied, the suppression motion is denied in part and granted in part and plaintiff's motion for summary judgment is granted.

## FACTS AND PROCEDURAL HISTORY

In the Fall of 1998, the New York City Police Department's Organized Crime Investigation Division's Money Laundering Unit ("MLU") began investigating money laundering organizations operating in New York City. Plaintiff's Statement Pursuant to Local Civil Rule 56.1 ("Pl. Rule 56.1 Stat.") ¶43; Supplemental Affidavit in Support of Search Warrant signed by Andrew Buchanan ("Buchanan Supp. Aff") annexed as Exhibit 11 to the Declaration of Laura D. Mantell ("Mantell Decl."). Among the targets of the MLU's investigation were two brothers, Andreas and Hernan Botero, and their mother, Luz Marina Gomez Alzate. Pl. Rule 56.1 Stat., ¶44; Declaration of Joseph Thompson ("Thompson Decl."), ¶2. MLU officers obtained a court ordered eavesdropping warrant for telephone number 917-861-7003, a number associated with Alzate. Based on the intercepted conversations, MLU officers learned that Alzate would contact either Andreas or Hernan to arrange for exchanges of cash.

On September 29, 2000, the MLU intercepted a conversation between Alzate and Andreas in which Alzate told Andreas to expect a call the following day regarding a "package." MLU officers believed "package" was code for a delivery of cash. Buchanan Supp. Aff. ¶7.

On September 30, the MLU intercepted a telephone conversation between Andreas and an "unidentified male" who was later identified as Cardona.[1]  Pl. Rule 56.1 Stat. ¶48; Buchanan Supp. Aff. ¶8.  Andreas and Cardona arranged to meet outside an auto parts shop located at 97th Street and Northern Boulevard in Queens at 3:15 p.m.  Buchanan Supp. Aff. ¶ 9.  At the appointed time, MLU officers observed Andreas meet with Cardona at the corner of 97th Street and Northern Boulevard.  Pl. Rule 56.1 Stat. ¶ 49; Buchanan Supp. Aff. ¶ 9.  After a brief discussion, Andreas left the scene in a livery cab.[2]  Id.  Cardona walked one block to his home, a basement apartment located 97-09 32nd Avenue.  Affidavit in Support of Search Warrant signed by Andrew Buchanan ("Buchanan Aff"), annexed as Exhibit 10 to the Mantell Decl. ¶ 8; November 5, 2004 deposition of Edison Cardona ("C.Dep1.") 76.  Two hours later, at approximately 5:10 p.m., Cardona emerged from his home, walked back to the auto parts shop and met with an unidentified individual.  Pl. Rule 56.1 Stat. ¶¶ 50-51;  Buchanan Aff. ¶ 8.  At this point, an MLU officer confronted both Cardona and the unidentified individual and asked for identification.  Id.  Cardona produced a New York State

---

[1]    Cardona denies that he is the unidentified male involved in the September 30, 2000, phone conversation and who was observed in front of the auto parts shop on that same day.  Claimant's Statement Pursuant to Local Rule 56.1 ("Cl. Rule 56.1 Stat.") ¶ 48-51; December 3, 2004 deposition of Edison Cardona ("C.Dep2.") 110-117.  However, Cardona offers no explanation as to why the unidentified male had a driver's license that identified him as Cardona and was observed both entering Cardona's home at 97-09 32nd Avenue and driving a 1985 Thunderbird sedan registered to him.  Buchanan Aff. ¶8-9; Buchanan Supp. Aff. ¶ 10.  Thus, even viewing all the evidence in the light most favorable to Cardona, there is no genuine question regarding whether Cardona was the individual who met with Andreas.

[2]    Plaintiff's Rule 56.1 statement and the affidavits annexed to the Mantell Declaration do not make reference to money being transferred between Cardona and Andreas.  However, in his Supplemental Affidavit in Support of the search warrant for Cardona's home, Buchanan testifies that on October 2, 2000 (two days after the meeting) Andreas told an undercover officer who Andreas believed was involved in money laundering activities that he had collected $150,000.  Buchanan Supp. Aff. ¶ 12.  Buchanan believes that a portion of this money came from Cardona on September 30.

driver's license with his name on it.  *Id.*  The address on the license was 25-30 Broadway, Astoria, Queens.[3]

Two weeks later, on Thursday, October 12, MLU officers intercepted a call in which a man, believed to be Cardona, told Andreas that he had $400,000 to deliver to him.  Buchanan Supp. Aff ¶ 13. Based on this conversation, MLU officers conducted surveillance in the vicinity of 97-09 32nd Avenue, Cardona's home.  Buchanan Supp. Aff. ¶13-14.  According to affidavits filed by the police, Cardona left his home around 3:00 p.m. with an olive green duffle bag and drove his car to 103rd Street and Lewis Avenue in Corona, Queens.  Pl. Rule 56.1 Stat. ¶¶ 53-55; Buchanan Aff. ¶9.  Near that location and shortly thereafter, Cardona met with a man later identified as Wilson DeJesus Castano Giraldo.  Buchanan Aff. ¶ 9.  Both men walked back to Cardona's car and Cardona gave Giraldo the olive green duffle bag.[4]  Buchanan Aff. ¶ 10.  Cardona, in his deposition, denies he left

---

[3]        In his deposition, Cardona admitted that he lived in Astoria, Queens (near 34th Street) when he first came to New York. C.Dep1, 68.

[4]        After parting with Cardona, Giraldo was stopped by MLU officers.  Buchanan Aff. ¶ 11; Pl. Rule 56.1 Stat. ¶¶ 57-58.  Giraldo gave officers permission to inspect the olive green bag.  *Id.*  Inside the bag, officers found $80,000 wrapped in a plastic bag, within another plastic bag, wrapped with duck tape.  Buchanan Aff. ¶ 11.  The number "80" was written in magic marker on the duck tape. *Id.*  Giraldo was taken into custody, questioned and released. Complaint, filed *in rem* on November 28, 2000 ("Compl.") ¶ 11.  According to the government, Giraldo's explanation for the origin of the funds gave the government probable cause to begin forfeiture proceedings and the $80,000 found on Giraldo represents a portion of the defendant funds.  Buchanan Aff. ¶ 11; Pl. Rule 56.1 Stat. ¶¶ 59.  However, Cardona has made no claim to this $80,000.  Interestingly, in his deposition, Cardona admitted that he had saved $80,000 for the purchase of a home.  He had wrapped the $80,000 in the same manner as the $80,000 seized from with Giraldo, and had written "80" in magic maker on the bag in the exact same manner that "80" had been written on the bag containing the money seized from Giraldo.  C.Dep2, 126. However, Cardona asserts that the $80,000 seized from Giraldo belonged to Giraldo, and his $80,000 was intermingled with the $518,826 of defendant funds he claims. C.Dep1, 131. Giraldo's claim for $80,000 of defendant funds was dismissed in June of 2004 for want of prosecution.  (ECF docket no. 61).

his home at 3:00 p.m.  C.Dep2, 121.  Cardona claims that, on the morning of October 12, 2000, he

went to search "around Roosevelt Avenue" for German Pulgarin, a man who was supposed to sell

Cardona a printing business for $50,000.  *Id.*  Cardona did not find Pulgarin and returned home at

about 11:30, watched television, took a nap, and only left his home again at around 5:00 p.m.

C.Dep2, 121-122, 131.

At either 5:00 p.m. or 5:45 p.m., Cardona left his home carrying a plastic shopping bag.

Buchanan Aff. 12; Pl. Rule 56.1 Stat. ¶ 59; Cl. Rule 56.1 Stat. ¶ 59.  Cardona drove two blocks from

his home to 82nd Street and Roosevelt Avenue.  Buchanan Aff. ¶ 12; Pl. Rule 56.1 Stat. ¶ 59;

C.Dep1, 131.  Cardona was observed driving around for one-half hour while  making calls on his

cellular telephone.  Buchanan Aff. ¶13; Pl. Rule 56.1 Stat. ¶ 59.  According to Cardona, he left his

home with $50,000 in a shopping bag and drove to meet with Pulgarin to purchase the printing

business but, as had happened earlier that day, he failed to find Pulgarin.  C.Dep2, 133-145; Cl. Rule

56.1 Stat. ¶ 59; Cardona Decl. 34.   Approximately one-half hour later, Cardona parked the car and

returned home, shopping bag in hand.  C.Dep2, 145-146; Buchanan Aff. ¶13.  Upon reaching his

home, MLU officers approached Cardona and asked Cardona where he lived and where he was

going.[5]  Buchanan Aff. ¶15;  Cardona Decl. ¶34-35; Rule 56.1 Stat. ¶ 60.  According to the

government,  when approached, Cardona produced his driver's license with the Astoria address but

stated that he actually lived with a friend in the rear apartment of 97-09 32nd Avenue.  Buchanan Aff.

¶15. The police then searched Cardona and observed that the bag had large quantity of U.S. currency

wrapped in plastic with brown packing tape and the number "50" written on it.  *Id.*  Cardona was

---

[5]     The government places the time that Cardona was confronted by MLU officers at
6:15 p.m.  Buchanan Aff. ¶15.  Cardona claims it was close to 5:00 p.m.  Cardona Decl. ¶34-35.
This issue is not material to the determination of the motion.

arrested.

Without contradicting the government, Cardona offers a slightly more nuanced account of the initial confrontation between himself and the MLU officers, which the court is required to accept as true for the purposes of the government's summary judgment motion.[6] Cardona claims that when the MLU officers approached him, they asked what was in the bag he was holding. C.Dep2, 147. Cardona responded by telling them there was $50,000 in the bag and he planned to purchase a business.[7] *Id.* When pressed, Cardona explained he worked in graphic arts, and showed the officers pay stubs from his former employer, a story the MLU officers found incredible. *Id* at 150. Cardona claims that this confrontation was much more violent, and the MLU officers pushed him against a parked van. In Cardona's account, the MLU officers threw him to the ground and placed a foot on the back of his neck. C.Dep2, 149-150; Cardona Decl. ¶ 40.[8]

---

[6] In contrast, in an Affirmation in Support of a Motion for a Return of Seized Property, Cardona's former counsel, Ismael Gonzalez, Esq., gives a radically different account of the search and seizure, one that does not comport with Cardona's deposition testimony. *See* Mantell Decl. Exhibit 18. However, Cardona's affidavit, also in support of the motion for the Return of Seized property is, for the most part, consistent with Cardona's deposition testimony. Ward Decl. Exhibit 11. Gonzalez's affidavit is not based on first hand knowledge, and cannot be used to defeat the government's motion for summary judgment. See *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); Fed. R. Civ. P. 56(e). However, because this affirmation was made by a member of the bar, presumably based on information provided to him by Cardona, the court will credit it to the extent it corroborates the government's, not Cardona's, account.

[7] Interestingly, in Cardona's affidavit in support of his Motion for a Return of Seized Property, sworn in February 2002, Cardona claims that, upon being confronted by the police, he told them he was going to use the money to purchase a printing machine from Mr. Pulgarin, not the entire business. Ward Decl., Exhibit 11.

[8] Cardona has also produced several unsworn statements from his neighbors attesting to his rough treatment by MLU officers. *See* Ward Decl. Exhibit 4. However, Cardona never produced contact information for these witnesses, and they were never deposed.

With Cardona now detained, Johnny Fisi, who lived in the rear apartment of 97-09 32nd Avenue, told the MLU officers that Cardona lived with him, and he led the officers to the apartment. *Id*; Pl. Rule 56.1 Stat. ¶ 62.[9] However, upon the officers' brief search of the apartment, Fisi explained that Cardona in fact lived in the front basement apartment of 97-09 32nd Avenue, not the rear one. Buchanan Aff. ¶15; Cardona Decl. 42. Cardona maintained that he lived in the rear apartment. Buchanan Aff. ¶15. The MLU officers asked Cardona for the keys to the front apartment. Buchanan Aff. ¶15; Cardona Decl. 38. At first, Cardona refused to give the MLU officers the keys, but then offered to let them in. Buchanan Aff. ¶16. However, upon reaching the door, Cardona threw the keys inside the apartment and shouted to someone in the apartment. *Id.* The police then attempted to push the door open but, before they could do so, Oscar Torres opened the door.[10] *Id.* at 17. The police asked Torres to leave the apartment so they could conduct a "protective sweep" of the premises. *Id*; Rule 56.1 Stat. ¶ 65. During the sweep, the police detected a strong odor of marijuana and observed a blue duffle bag in a closet without doors. Buchanan Aff. ¶17; Pl. Rule 56.1 Stat. ¶ 66. Cardona, who claims to have been handcuffed at the time, was then led into the apartment. C.Dep2, 161. Once inside, Cardona stated that the bag contained $400,000 in cash. Buchanan Aff. ¶18; Pl. Rule 56.1 Stat. ¶ 67.

With respect to the officers' entry of his home, Cardona claims that, after a search of Fisi's

---

[9] According to Cardona, Fisi had been drinking that afternoon. C.Dep2, 149.

[10] The domestic arrangement between Torres and Cardona is unclear. It appears that they shared a common front door and then a small vestibule in which Torres lived. C.Dep1, 80. However, in his deposition, Cardona states "I didn't share anything with him. I had my own area and he has his own little spot aside from me." C.Dep2, 154. There is no mention of whether there was a common kitchen area or bathroom area. Moreover, it appears that John Fisi had a separate apartment in the rear of the building, with a separate entrance. C.Dep1, 79. Torres did not pay any rent to Cardona. C.Dep1,80.

rear apartment (in the mistaken belief that Cardona lived there), the MLU officers broke down the door leading to the common area that Cardona and Torres shared. *Id.* at 153. Torres was allegedly sleeping immediately behind the front door at the time the police forcefully entered. C.Dep2, 153. Once inside, the offers encountered a second locked door, this one to Cardona's separate living area. *Id.* Cardona then unlocked the door to his living area, partially because he believed that the MLU officers would break it down otherwise. *Id.* at 153 ("they were about to break the door where I live and told them that I had the keys."). Cardona also claims he was arrested outside his home. *Id* at 151, 160.

The MLU officers applied for and received a search warrant issued by New York State Supreme Court Justice John A. Barone on the strength of their observations and Cardona's statements that the bag in his room contained $400,000. Mantell Decl., Exhibit 10-11, 13; Pl. Rule 56.1 Stat. ¶ 68. The warrant was executed immediately thereafter. Thompson Decl. ¶ 4; Pl. Rule 56.1 Stat. ¶ 74. MLU officers found and seized $468,826, a black composition notebook containing currency records, a list of phone numbers, and amounts that the government claims to be related to money laundering activity. Thompson Decl. ¶ 4; Thomasina Decl., Exhibit 1; Pl. Rule 56.1 Stat. ¶ 74. One of the numbers on listed is 917-861-7003, the number associated with Alzate. Thomasina Decl., Exhibit 1; Pl. Rule 56.1 Stat. ¶ 75. One of the entries on the list has the name "Wilson" with the number "80". *See* Thomasina Decl., Exhibit 1; Pl. Rule 56.1 Stat. ¶ 77. Cardona admits that the list belongs to him and is in his handwriting, but claims that it relates to his efforts to distribute "small amounts of money" to Colombian friends. C.Dep2, 181; Cardona Decl. ¶55. He further states that government tampered with the list. Cl. Rule 56.1 Stat. ¶ 75-76; Cardona Decl. 15.

After the officers had secured the apartment, Cardona was transported to 115th Precinct for

questioning. Pl. Rule 56.1 Stat. ¶ 69. Cardona claims that he was arrested, transported to the precinct and questioned, but was never provided *Miranda* warnings. The government is silent as to whether Cardona was given his *Miranda* warnings and whether he was ever in custody. According to the government, and as corroborated by the affirmation of Ismael Gonzalez, Cardona's former counsel ("Gonzalez Aff."), annexed as Exhibit 18 to the Mantell Decl., Cardona stated that he was paid $5,000 to store the suitcase. Gonzalez Aff. § 5. According to the complaint, but now denied by Cardona, Cardona admitted to the police under questioning that: (1) he had received the money from three different people from October 9 to October 12 (Compl.¶ 65; Pl. Rule 56.1 Stat. ¶ 70); (2) he intended to deliver the money to other people and had received a commission for doing so (Compl.¶ 68; Pl. Rule 56.1 Stat. ¶ 71); (3) he would receive a telephone call from someone telling him where to deliver the money (Compl.¶ 69; Pl. Rule 56.1 Stat. ¶ 72); (4) he gave $50,000 to a man that afternoon, but did not know the man's identity (Compl.¶ 69; Pl. Rule 56.1 Stat. ¶ 71); and (5) he thought the money might be "bad money" or "drug money" (Compl.¶ 70, 73-74; Pl. Rule 56.1 Stat. ¶ 73). Cardona was never charged with any crime. [11]

Relevant to the determination of both the motion to dismiss under Rule 12(f) and the motion for summary judgment under Rule 56 is whether there is a legitimate source for the defendant funds. Cardona claims that he had a thriving business exporting used printing presses to Colombia. Cardona Decl. ¶8. Cardona claims that he came to the United States with $30,000. Cardona Decl. ¶7. Cardona included a chart demonstrating that from 1992 to 1999 his income from his job at

---

[11]     Cardona now denies that he made these statements. Accordingly, taking all the facts in the light most favorable to Cardona, the court will disregard them in determining this motion. In any event, for the reasons set forth below, had there been a civil forfeiture trial, the statements, if made, would have been suppressed because they would have been taken in violation of Cardona's Fifth Amendment rights.

Tristar (a printing company where he worked), his wife's income and his income from selling the used printing presses totaled $629,266.[12] *See* Ward Decl. Exhibit 2. *Id.* Curiously, Cardona claimed a total of only $378,815 in gross income on tax returns filed from 1992-1999, exclusive of 1997, a year for which Cardona did not produce a tax return. *See* Pl. Rule 56.1 Stat. ¶¶3-13.

By his own calculation, from the $629,266 that Cardona claimed he earned from 1992 through 1999 both in wages and by selling printing equipment, he was able to save at least the $518,826, constituting defendant funds. Ward Decl. Exhibit 2. Thus, Cardona's living expenses were the difference between what he earned and what he saved: $110,440. *Id.* This equals, on average about $15,777 in living expenses per year over seven years. At his deposition, Cardona testified that he spent $150 a month on food, $60 a month on union dues, $50 a month on entertainment, and $400 per year in clothing. His phone bills were, on average $40 per month. Pl. Rule 56.1 Stat. ¶14. Cardona also had car expenses, and traveled to Colombia approximately six to eight times since he moved to the United States. Pl. Rule 56.1 Stat. ¶16. From 1993 to 1999, exclusive of 1997, Cardona reported $44,083 in deductible expenses on his tax returns, including job related expenses, non-reimbursed medical expenses, charitable gifts, child care expenses and losses from theft. Pl. Rule 56.1 Stat. ¶¶18-25. In addition, Cardona's rent has ranged from $250 per month to $400 per month. Pl. Rule 56.1 Stat. ¶26. Since coming to the United States, Cardona has owned several used cars and has lived in a variety of apartments. One apartment did not have heat

---

[12]     In his declaration, Cardona states that from 1993-1997 he sold printing equipment worth $198,000, and $26,000 worth of electronics. Cardona Decl. ¶8. These numbers are gross, and do not account for purchasing expenses, shipping expenses and customs duties. Additionally, it is impossible to reconcile these sums with the sums listed in Cardona's response to the government's interrogatories and the sums Cardona quoted in his depositions, all of which appear to be different. *See* Ward Decl. Exhibit 2.

and he was required to share another with a dog.  Pl. Rule 56.1 Stat. ¶27.  According to Cardona, he lived frugally in an effort to save money to purchase a home and a business.  Cardona Decl. ¶¶ 29, 54.

Cardona was not only hoarding cash in his home;  he also maintained several bank accounts. Pl. Rule 56.1 Stat. ¶33.  From August to October 2000, around the time of the seizure, Cardona had approximately $26,000 in two banks and often made withdrawals from the accounts.  Pl. Rule 56.1 Stat. ¶¶34-35.  Cardona testified that he did not trust banks, and instead kept the majority of his money at home or in "cabinets of machines at work that [he] could keep locked."  Cardona Decl. Pl. ¶¶19-20.  Thus, Cardona claims that the bulk of his savings was in his home on the evening of October 12, 2000, when it was seized by MLU officers.

On November 28, 2000, the government filed a verified complaint against defendant funds *in rem.*  The complaint alleges that the defendant funds constitute property involved in and proceeds traceable to transactions or attempted transactions in violation of 18 U.S.C. §§ 981 and 1956 (money laundering), and proceeds traceable to violations of 21 U.S.C. § 841 et seq. (controlled substances) and are therefore subject to seizure and forfeiture under 18 U.S.C. § 981 and 21 U.S.C. § 881. Finding that the government had established the requisite cause for the seizures, U.S. Magistrate Judge Viktor V. Pohorelsky issued warrants for arrest of the funds on December 5, 2000.  On February 7, 2001, claimant filed a claim for $518,826 of the defendants funds, and answered the complaint on the same day.

## DISCUSSION

### Motion to Strike the Claim for Lack of Standing

*Standard of Review*

Fed. R. Civ. P. 12(f) provides: "[u]pon motion made by a party before responding to a pleading . . . the court may order stricken from any pleading any insufficient defense." In a civil forfeiture action, such as this one, Rule 12(f) provides the proper procedural basis for the government's motion to strike Cardona's claim to a portion of the defendant funds because Cardona is akin to an intervenor-defendant and his claim amounts to a defense to the forfeiture. *See United States v. $79,000 in Account Number 2168050/6749900 at the Bank of New York,* 96 CIV 3493, 1996 WL 648934, at *2 (S.D.N.Y. Nov. 7, 1996). The standard of review for a 12(f) motion is identical to that of a 12(b)(6) motion and the court's review is limited to the facts alleged in the complaint, answer and the notices of claim. All extrinsic evidence must be disregarded. *See United States v. All Funds on Deposit on or Before November 8, 1994 in Citibank Account No. 42773634 in the Name Imtiaz Ahmed Kahn,* 955 F. Supp. 23, 25 (E.D.N.Y. 1997).

However, because both Cardona and the government have submitted extrinsic evidence on the issue of Cardona's standing, and, at this late stage of the litigation, neither can be surprised by the other's submissions, the government's 12(f) motion shall be treated as a motion for summary judgment on Cardona's standing. *See Garofalo v. City of New York,* 93 CV 7798, 1994 WL 285803, *1 (S.D.N.Y. June 27, 1994) ("however, where the parties have each submitted extrinsic evidence, the court may treat a motion to strike as a motion for partial summary judgment."); *Paretti v. Cavalier Label Co.,* 702 F. Supp. 81, 85 (S.D.N.Y. 1988); *see also Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991). A Rule 12(f) motion, like a motion for summary judgment, requires the court to "view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir 1994).

*Cardona has Standing to Assert the Claim*

In order to properly assert a claim for the funds, Cardona must demonstrate both statutory standing and constitutional standing. *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999). A judicial forfeiture proceeding is an action *in rem* and the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rules") apply to actions *in rem*. *See* Fed. R. Civ. P., Supp. Rule A(2); *United States v. U.S. Currency in the Amount of $2,857.00*, 754 F.2d 208, 212 (7th Cir. 1985). Supplemental Rule C(6) sets forth the procedural requirements that a claimant must comply with to establish standing to contest an *in rem* forfeiture proceeding. The rule provides that the claim "shall be verified on oath or solemn affirmation and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action." *See Mercado v. United States Customs Service*, 873 F.2d 641, 645 (2d Cir. 1989). Cardona has established statutory standing. *See* Ward Decl. Exhibit 11.

With respect to Cardona's constitutional standing, the requirements of Article III limit the subject matter jurisdiction of federal courts to "cases" and "controversies." As a general matter, "to establish standing 'the claimant need not prove the full merits of [his] underlying claim. All that needs to be shown is a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and prudential considerations defining and limiting the role of the court." *United States v. $557,933.89, More or Less, in United States Funds*, 287 F.3d 66, 79 (2d Cir. 2002) (*quoting Torres v. $36,256.80 U. S. Currency,* 25 F.3d 1154, 1158 (2d Cir. 1994)). Standing in civil forfeiture matters is different from standing in other matters because it is the government who is the plaintiff, not the claimant. *United States v. $557,933.89, More or Less, in United States*

*Funds*, 287 F.3d at 79. Thus "the function of standing in a forfeiture action is therefore truly threshold only – to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *Id*; *Lopez v. United States*, 96 CV 1972, 2006 WL 2788999, *3 (D.D.C. Sept. 26, 2006) ("at the pleading stage, a simple claim of ownership is sufficient to establish standing to contest a forfeiture."). Nevertheless, at the summary judgment stage, the government is entitled to challenge the claimant's legitimacy based on information obtained during the discovery process. *See United States v. U.S. Currency in Sum of One Hundred Eighty-Five Thousand Dollars ($185,000)*, 455 F. Supp. 2d 145, 151 (E.D.N.Y. 2006)

To establish Article III standing in a civil forfeiture proceeding, the claimant must demonstrate some ownership or possessory interest in the property at issue. *See United States v. One 1982 Porsche*, 732 F. Supp. 447, 451 (S.D.N.Y.1990). A claimant may prove this possessory or ownership interest "by actual possession, dominion, control, title, or financial stake." *United States v. Contents of Account Numbers 208-06070 and 208- 06068-1-2,* 847 F. Supp. 329, 333 (S.D.N.Y.1994)*. It is undisputed that Cardona was in possession of both the $50,000 in the plastic bag he was carrying on the street, and the $468,826 stored in a duffle bag in a closet of his apartment. *See* Pl. Rule 56.1 Stat. ¶61 and ¶64.

The court finds that possession and injury from being denied the funds is sufficient to allow Cardona to assert Article III standing. Requiring more than mere possession short circuits the Civil Asset Forfeiture Reform Act's ("CAFRA") requirement that the government show, by a preponderance of the evidence, that forfeiture applies. If the government were permitted to require that a claimant show more than mere possession to maintain standing, the government's burden would be immeasurably easier to satisfy. 18 U.S.C. § 983; *$185,000,* 455 F. Supp. 2d at 153

14

("challenges to a claimant's standing before resolution of the Government's underlying claim of forfeiture could allow the [g]overnment to avoid CAFRA's elevated burden of proof."); *United States v. Cambio Exacto, S.A.*, 166 F.3d at 528 ("while ownership and possession generally may provide evidence of standing, it is the injury to the party seeking standing that remains the ultimate focus.").

Cardona's claim is not simply a "bald allegation[] of ownership unsubstantiated by affidavits or other evidence." *Lopez*, 2006 WL 2788999 at *3; *Torres*, 25 F.3d at 1158. Cardona has put forward myriad documents demonstrating that he earned money from legitimate sources. *See* Ward Decl. Exhibits 4,6 and 8; Cardona Decl. ¶¶ 7-23; *c.f. United States v. $18,800,* 02 CV. 5752, 2004 U.S. Dist. LEXIS 25055, *7 (E.D.N.Y., Jan. 3, 2005) (claimant failed to provide any documents showing the origin of the defendant funds). Cardona has stated that the seizure of the portion of the defendant funds he claims has harmed him because he was unable to buy a printing business for $50,000 and was unable to spend the balance to purchase a home. Cardona Decl. ¶32, 54. Denying Cardona over $518,000 of defendant funds for any period of time is an economic harm, and one that Cardona has the constitutional right to bring before a court of competent jurisdiction. *See United States v. Cambio Exacto, S.A.*, 166 F.3d at 528 ("substantial economic harm is plainly the type of injury for which parties may seek redress in federal court.").

In cases like *Mercado v. United States Customs Service*, where the claimant acknowledges that he does not own the property but nonetheless claims standing to seek its return because it was seized from him, the claimant does not have standing. 873 F.2d at 641. Here, Cardona contends that the defendant funds are his. This is also not a case where the money appears to belong to someone else. *See Torres v. $36,256.80 U.S. Currency,* 25 F.3d 1154 (2d Cir. 1994). Here, Cardona is the

only claimant.  *But see United States v. $138,381.00*, 240 F. Supp. 2d 220, 232-233 (E.D.N.Y. 2003) (no standing where funds were seized from claimants and the claimants alleged that the defendant funds came from a variety of somewhat incongruent sources such as meager wages, a divorce settlement, lottery winnings).  *See* Cardona Decl. ¶¶11-23; 29; C.Dep1, 25-26; C.Dep2, 58-88.

Nevertheless, the government alleges that the Cardona has not suffered an injury sufficient to give rise to standing because "it is . . . clear upon just a cursory review of Cardona's finances that he could not have accumulated the $518,826 that was sized from him."  Pl. Memo of Law in Support, 9.  The court agrees with the government that a legitimate source for the defendant funds is wanting, and Cardona's explanation for how he came to accumulate $518,000 in cash is dubious, at best.  However, the fact that Cardona cannot prove that there is a legitimate source of the funds does not warrant denial of Cardona's standing.

Taking all the evidence of Cardona's possession, ownership, and injury form seizure in the light most favorable to Cardona, and understanding that standing in a civil forfeiture action is only a threshold issue to assure that the government is required to prove its claim only to a person with a legitimate interest, the court denies the government's motion to strike Cardon's pleadings for lack of standing.  However, as discussed further below, Cardona's failure to satisfactorily explain the legitimate origin of the funds requires the court to grant summary judgment to the government because there is no genuine material issue of fact with respect to the connection between defendant funds and illegal activity.  Before reaching that conclusion, however, the court must first address Cardona's motion to suppress some of the evidence linking defendant funds to illegal activity.

### Cardona's Suppression Motion

Cardona attacks the admissibility of the evidence that the government maintains links

defendant funds to illegal activity, namely the evidence acquired when he was stopped in front of his home, the evidence obtained in the allegedly unconstitutional search of home and the statements he allegedly provided police under questioning.

This civil forfeiture action was started by the government pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rules") at a time when the funds were in possession of the New York City Police Department. *See* Fed. R. Civ. P., Supp. Rule A(2). Pursuant to those rules, a complaint was filed by the United States Attorney's Office for the Eastern District of New York and a warrant was issued for defendant funds. *See* 18 U.S.C. § 981(b)(2)(a); 21 U.S.C. § 881(b).[13] Judge Pohorelsky issued the arrest warrant for the defendant funds in December 2000 after determining that the government sufficiently established probable cause to believe that defendant funds were subject to forfeiture.

Thus, even if the court determines that the evidence of forfeitability was illegally obtained, that does not mean that the government did not meet its burden of pleading the forfeitability of funds– that issue was already decided when Judge Pohorelsky issued the arrest warrant and when the court denied Cardona's Rule 12(b)(6) motion to dismiss the complaint. *See* ECF Docket Entries Nos. 26 and 47. However, the government now must show that defendant funds are forfeitable by

---

[13]     18 U.S.C. § 981(b)(2)(a); 21 U.S.C. § 881(b) requires that property can only be seized pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant ("non-judicial seizure") if: (1) a complaint for forfeiture has been filed in the United States district court and the court has issued an arrest warrant *in rem* pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; (2) there is probable cause to believe that the property is subject to forfeiture and the seizure is made pursuant to a lawful arrest or search, or another exception to the Fourth Amendment warrant requirement would apply; or (3) the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency. *Id*.

a preponderance of the evidence. *Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119, 1124 (2d Cir. 1993) ("the seizure and forfeiture of property are two distinct events under the civil forfeiture laws . . .[w]hile both events require the government to have probable cause, the government is not required to demonstrate probable cause until the forfeiture trial unless a claimant challenges the validity of the seizure before trial.").  Moreover, unlike at the pleading stage, in a summary judgment motion (or at trial) "[f]or purposes of establishing probable cause for forfeiture, the government may rely upon any evidence it has lawfully obtained up to the time of the forfeiture trial." *$557,933.89*, 287 F.3d at 89 (2d Cir. 2002).

Cardona claims that the evidence used to support the forfeitability of the defendant funds should be suppressed at trial (and cannot be used to grant the government summary judgment) because it was unconstitutionally obtained by the New York City Police Department.  The exclusionary rule applies to civil forfeiture proceedings and evidence, if unconstitutionally obtained, must be excluded from the forfeiture trial, and is not admissible evidence upon which to grant the government summary judgment.  *See One 1958 Plymouth Sedan v. Com. of Pa.*, 380 U.S. 693 (1965); *$557,933.89,* 287 F.3d at 80 ("the Supreme Court has held that the Fourth Amendment exclusionary rule applied in civil forfeiture cases.")

*The Initial Stop and Search of Cardona and the Seizure of the $50,000*

Pursuant to the Supreme Court's ruling in *Terry v. Ohio*, law enforcement officials are entitled to stop a suspect in public and conduct an investigatory detention without a warrant, provided they have reasonable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The Second Circuit elaborated that a *Terry* stop may only be made when the level of suspicion rises above "an 'inchoate and unparticularized suspicion or hunch of criminal activity"

*United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) (*quoting Terry*, 392 U.S. at 27). The facts prompting the warrantless stop are judged against an objective standard of reasonableness. The court must determine whether the facts available to law enforcement officers present at the stop would "warrant a [person] of reasonable caution in the belief that taking such action was appropriate." *Terry*, 392 U.S. at 21-22. In addition, the court must consider "the totality of the circumstances" in determining whether reasonable suspicion exists in order to make this brief investigatory stop. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

The court finds that, based upon their knowledge of the ongoing money laundering investigation, court ordered wiretaps of cellular telephone conversations and Cardona's actions, the MLU officers had reasonable suspicion to stop Cardona and investigate their suspicions that he was engaged in money laundering. On September 30, 2000, Cardona was observed by MLU officers meeting with another suspected money launderer, Andreas. On October 12, MLU officers intercepted a call between Andreas and Cardona discussing the exchange of $400,000. That same day MLU officers observed Cardona leave his home carrying an olive green duffel bag. He drove to 103rd St. and Lewis Avenue where Cardona gave the bag to a man later identified as Giraldo. Giraldo was stopped by MLU officers and found in possession of $80,000 wrapped in plastic and fastened with duct tape marked "80." Later that day, MLU officers observed Cardona leave his home carrying a plastic shopping bag. He drove around for thirty minutes, repeatedly making calls on his cell phone, then returned home. These suspicious activities without a doubt gave the MLU officers the reasonable suspicion necessary to perform a brief investigatory stop on Cardona.

The court further finds that the MLU officers' search of Cardona's bag, in which they found $50,000 of defendant funds, was lawful. Once reasonable suspicion exists and an individual is

stopped there is a "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry,* 392 U.S. at 27. In addition to searching the individual, the search may also extend to a bag from which the individual may readily grasp a weapon. *See United States v. Barlin*, 686 F.2d 81 (2d Cir. 1982) (holding that search of defendant's handbag was lawful as there was a high likelihood a woman would keep a weapon in a handbag); *United States v. Morales*, 549 F. Supp. 217, 223 (S.D.N.Y 1982) (holding that a check of defendant's bag was lawful as there was the likelihood the bag contained a weapon). Indeed, there is no doubt that at the time they stopped Cardona, the MLU officers legitimately suspected that Cardona might be armed. They had reasonable suspicion to believe that Cardona was carrying massive quantities of cash, having already witnessed him give $80,000 in cash to another individual earlier in the day. It was not unreasonable to assume that an individual transporting that much cash would be armed, if only for his own protection. Moreover, the MLU officers did not search the bag, they merely looked into it in order to ascertain whether the bag contained a weapon. The search of the bag, intended for the officers' safety, was reasonable and minimally intrusive and did not "spill over into an unreasonable search for evidence." *United States v. Vigo*, 487 F.2d 295, 298 (2d Cir. 1973).

When the MLU officers looked in the bag, they observed a large quantity of United States currency wrapped in plastic with brown packing tape and the number "50" written on it. As a matter of law, the possession of an extraordinary sum of cash is probative of illegal activity. *See United States v. $31,990 in U.S. Currency*, 982 F.2d 851, 854 (2d Cir. 1993) (presence of a large amount of cash supports an inference of illegal activity); *United States v. $2,500 in U.S. Currency*, 689 F.2d

10, 16 (2d Cir. 1982) (noting that cash amount of $2,500 "is substantially greater than is commonly kept in residential premises by law-abiding wage earners").  Thus, the MLU officers, specialists in detecting money laundering activities, seized the $50,000 of defendant funds without a warrant pursuant to the plain view exception to the Fourth Amendment.  *$557,933.89,* 287 F.3d at 81 ("it is well settled that, under the 'plain view' doctrine, law enforcement personnel may seize an item without a warrant provided that it is 'immediately apparent that the object is connected with criminal activity.") (*quoting United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992)).  Accordingly, there is no basis upon which to suppress the $50,000.

*The Search of Cardona's Residence*

Similarly, based upon the facts set forth above, the MLU officers had sufficient probable cause to arrest Cardona for money laundering.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). *See also United States v. Escabi*, 05 CR 0540, 2005 WL 148997, *5 (E.D.N.Y., Sept. 7, 2005) ("if probable cause did not exist before the government stopped Escabi, it certainly existed after discovery of the large bundle of cash. Escabi has no discernable source of income, and his possession of a large quantity of cash is in and of itself suspicious.").

Once Cardona was arrested, the MLU officers preformed a warrantless security sweep of Cardona's apartment, located immediately adjacent to where he was arrested.  The MLU officer's observations during the sweep precipitated in obtaining a warrant to preform a full search of the apartment.  As to the initial warrantless search, "exceptions to the warrant requirement are few in number and carefully delineated and . . .  the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) (quotation marks and citation omitted).   The Fourth Amendment

prohibits warrantless entries by police unless the entry is authorized by a recognized exception to the warrant requirement. *See Minnesota v. Olson*, 495 U.S. 91, 100 (1990). Protective sweeps have been upheld as they are quick, limited searches, often incident to arrest, and conducted to insure the safety of the police and others. *United States v. Oguns*, 921 F.2d 442, 446-47 (2nd Cir. 1990) (extending *Buie* to include protective sweeps into a home when a suspect is arrested immediately outside the home). The police may conduct a warrantless search if the person whose home is entered has consented to the entry. *See United States v. Deutsch*, 987 F.2d 978, 883 (2d Cir. 1993).

The government contends that the warrantless search of Cardona's apartment was a "protective sweep." For law enforcement officers to conduct a warrantless protective sweep of a premises after an arrest outside thereof they must have (1) a reasonable belief that other persons are inside, and (2) a reasonable belief that the other persons are aware of the arrest outside the premises and might destroy evidence, escape or jeopardize the safety of the officers or the public. *Oguns*, 921 F.2d at 446. In light of the information available to the MLU officers at the time of Cardona's arrest, the MLU officer's sweep of Cardona's apartment was constitutional because the series of events, as described by both Cardona and the government, gave MLU officers the necessary foundation to conduct a protective sweep of Cardona's apartment.

According to the government, Cardona first stated that he lived with a friend in the rear apartment of 97-09 32nd Avenue, which was false. Fisi, who actually lived in that apartment initially corroborated Cardona's false statement, but then changed his mind. Fisi then truthfully stated that Cardona lived in the front basement apartment of 97-09 32nd Avenue, not the rear one. Cardona continued to maintain that he lived with Fisi in the rear apartment. The MLU officers asked Cardona for the keys to the front apartment but Cardona refused to give them. Cardona then shouted to

someone inside the apartment, providing the police a reasonable belief that someone was inside the apartment. According to the government's account, the MLU officers now had reason to believe that Cardona (1) wished to delay the MLU officer's entry into the apartment by falsely stating that he lived elsewhere and by refusing to provide his keys and (2) wished to alert someone in the apartment to the fact that the police were outside to possibly destroy evidence or threaten the safety of the MLU officers. *See Oguns*, 921 F.2d 442, 446-47. Thus, the court finds that the MLU officers had the exigent circumstances required to conduct a warrantless protective sweep of Cardona's apartment.

In light of the heavy burden that the government has in demonstrating the existence of an exception to the Fourth Amendment, the court takes all the facts in the light most favorable to Cardona. *See Loria v. Gorman,* 306 F.3d 1271, 1286 (2d Cir. 2002). However, even according to Cardona's account, which excludes him shouting anything to Torres and denying that he lived at 97-09 32nd Avenue, the court finds no constitutional violation. Cardona claimed that he and Torres lived completely separately. *See* C.Dep2, 154. Thus, Cardona has no standing to challenge the MLU officer's entry into Torres's home since Cardona had no expectation of privacy in Torres's personal space. *See United States v. Fields*, 113 F.3d 313, 320 (2d Cir.1997) ("the extent of a defendant's property or possessor interest in the place searched is a factor generally considered in determining the reasonableness of a defendant's expectation of privacy"); *United States v. Gruttadauria*, 439 F. Supp. 2d 240, 250 (E.D.N.Y 2006) ("A defendant lacks 'standing' when the contact with the searched premises is so attenuated that no expectation of privacy could be considered reasonable."). Even if the court assumes that Torres was, in fact, living in a hallway leading to Cardona's apartment, a warrantless search is permitted in a common hallway. *United States v. Barrios-Moriera*, 872 F.2d 12, 14 (2d Cir. 1989), *abrogated on other grounds*, 496 U.S. 128 (1990).

This is true even where the door leading to the common hallway is locked. *Id.* In any event, Cardona has the burden of establishing standing to challenge the Fourth Amendment violation, and, assuming his statements were true, he has failed to do so. *See United States v. Osorio,* 949 F.2d 38, 40 (2d Cir. 1991).

Once the MLU officers entered Torres' apartment, the officers encountered a second locked door, this one to Cardona's apartment. The court finds that, at this point, exigent circumstances existed allowing the officer's warrantless entry into Cardona's apartment. Cardona's false statements as to his residence and Fisi's conflicting statements as to Cardona's residence certainly gave the officers reasonable suspicion that Cardona had evidence of criminality in his apartment. Cardona initially refused to let the officers into his apartment but then agreed. Even if Cardona refused to open the door, the MLU Officers could have forced their way in to his apartment because it was only reasonable to assume that additional individuals could be lurking in the apartment and could have posed a danger to the officers and others. Under the circumstances, a protective sweep of Cardona's locked apartment was permissible because the MLU officers had "articulable facts which, taken together with the rational inferences from those facts, [warranted] a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. [14]

---

[14]     The court is also mindful that two other rules regarding protective sweeps are applicable. First, the Second Circuit has held that protective sweeps are permitted even when an officer is on the scene for reasons other than making an arrest. *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005). ("the fact of an arrest or an attempted arrest (with or without an arrest warrant) is not a necessary precondition to a lawful protective sweep. The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment."). Second, when police officers act in a legal manner, the court does not examine the officer's subjective motives for their actions, including the officers possible desire to create the circumstances that would allow for a protective sweep. *See United States v. MacDonald,* 916

Once inside Cardona's apartment, the MLU officers observed a duffle bag, in plain view. According to the MLU officers, Cardona admitted that there was $400,000 in cash in the bag. While Cardona now denies that he said anything about the contents of the bag, in his Affidavit in Support of his motion for the return of defendant funds, Cardona swore that he made the statement to the police. *See* Ward Aff. Exhibit 11. The court also notes that the MLU officers initiated their surveillance of Cardona on October 12 based on an intercepted telephone call between Cardona and Andreas where Cardona said he had $400,000 to give to Andreas. The court finds that whether or not Cardona identified the contents of the duffle bag, its presence, along with Cardona's behavior, the MLU officers' prior surveillance and the information gathered from the investigation provided sufficient probable cause for them to apply for a search warrant, which they did. *See Illinois v. Gates,* 462 U.S. 213, 232 (1983) ("probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts."); *United States v. Zabala,* 52 F. Supp. 2d 377, 385-386 (S.D.N.Y. 1999) (warrant issued based on observation of large quantities of money in plain sight during a protective sweep); *see also Texas v. Brown*, 460 U.S. 730, 739 (1983) (under the plain view doctrine, "if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.").

While the application for the search warrant was pending, MLU officers remained at Cardona's apartment, and did not execute the warrant until early on the morning of October 13, 2000. Contrary to Cardona's contention, his Fourth Amendment rights were not violated when the MLU officers remained in his apartment. Such action was necessary to secure the apartment and prevent the destruction of evidence while other officers sought a search warrant in good faith. *See*

F.2d 766, 771 (2d Cir. 1991).

*Segura v. United States*, 468 U.S. 796, 798 (1984).

Upon execution of the warrant, MLU officers found and seized $468,826, a black composition notebook containing currency records and a list of phone numbers and amounts that the government claims is related to money laundering activity. There are no grounds to suppress any of this evidence during the forfeiture trial and this evidence can be considered by the court in determining the government's motion for summary judgment. To the extent that Cardona claims that the warrant issued by Justice Barone was based on false statements by the affiant officer, the court finds Cardona's assertions completely lacking in merit and factual support. *See Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994).

### Cardona's Statements Made After His Arrest

Cardona also seeks suppression of several statements he made to the MLU officers on the grounds that they were elicited during a custodial interrogation without having been advised of his *Miranda* rights. As a general rule, statements elicited during a custodial interrogation should be suppressed if a suspect is not advised of his rights unless the government can prove by a preponderance of the evidence that the defendant voluntarily waived his right to counsel and right against self incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). It is undisputed that Cardona was not advised of his *Miranda* rights.

Although the government claims that suppression must be denied because Cardona does not affirmatively state in his Rule 56.1 statement that he was not administered his *Miranda* rights, the burden is on the government to show that Cardona's statements were voluntarily made and that his waiver was voluntary. Moreover, if a defendant is not advised of his *Miranda* rights prior to making his custodial statement, an irrefutable presumption of compulsion arises and the state cannot show

26

that the suspect waived his rights voluntarily. *United States v. Gaines,* 295 F.3d 293, 298 (2d Cir. 2002); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). Here, the government has made no effort to show that Cardona's statements, made while being detained and transported to the police precinct, were made prior to any interrogation by the police. Further, there is no indication that Cardona knew or was led to believe that he would be free to leave at anytime. As such, Cardona's statements made at the police precinct, and while being transported to it, are suppressed. *See United States v. Newton,* 369 F.3d 659, 669 (2d Cir. 2004) (*Miranda* warnings required, where the questioning is "conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak.").

The question now becomes whether the suppressed statements are admissible in a civil forfeiture proceeding. The Fifth Amendment right against self incrimination, a right primarily afforded to criminal defendants, applies in a civil forfeiture cases.[15] *United States v. U.S. Coin and Currency*, 401 U.S. 715, 718 (1971); *United States v. Premises Known as 281 Syosset Woodbury*

_____

[15]    Although the law with respect to the admissibility of Cardona's statements appears to be in his favor, Cardona nevertheless asserts that he never made the statements. Cardona Decl. 44; Cl. Rule 56.1 Stat. ¶ 70-73. The court can only assume that this is a misguided attempt by Cardona to create an issue of fact to preclude summary judgment. *See, e.g $185,000,* 2006 WL 2831163 *5. The court finds Cardona's claims that he never made the statements to be incredible. Cardona has already submitted two sworn documents to the court asserting that he made certain incriminating statements, although not necessarily the ones the MLU officers attributed to him. His prior counsel stated in an affidavit that Cardona told the officers that the money was not his and that he had been paid $5,000 to store the suitcase, although it was a lie. *See* Ward Decl. Exhibit 9. Second, Cardona himself swore that he told the officers that there was $400,000 in the suit case, although he now denies doing so. Ward Decl. Exhibit 11. Taken together, these two inconsistencies lead the court to discredit Cardona's assertion that he never made the statements attributed to him. Cardona certainly has not created a genuine issue of material fact through his bold denial. *See Farias v. Instructional Sys.,* 259 F.3d 91, 99 (2d Cir. 2001) (declining to accept "conclusory statements unsupported by the record" as grounds to deny summary judgment). Similarly, because the statements are being suppressed, whether or not he actually made them is irrelevant.

*Road, Woodbury, N.Y.*, 71 F.3d 1067, 1070 (2d Cir 1995) ("many protections typically reserved for criminal trials have been extended to civil forfeiture proceedings."); *United States v. $84,740.00 Currency*, 981 F.2d 1110, 1114 (9th Cir.1992) (recognizing that Fourth Amendment exclusionary rule and Fifth Amendment protection against self-incrimination apply in civil forfeiture proceedings). Thus the statements attributed to Cardona while being questioned by MLU officers at the precinct after his arrest are suppressed as to the instant action.

**Plaintiffs Summary Judgment Motion**

*Standard of Review*

Summary judgment should be granted where, when viewed in the light most favorable to the non-moving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 447 U.S. 317 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248; *see also Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991).

The Supreme Court has recently revised the summary judgment standard by requiring the court essentially to weigh the evidence presented by the non-moving party before allowing that evidence to be used to defeat a motion for summary judgment. Under the new standard, evidence presented by the non-moving party that is "blatantly contradicted by the record" should not be

accepted by the court for purposes of defeating a motion for summary judgment. *Scott v. Harris*, 127 S.Ct. 1769, 1776, (2007). In opposing a motion for summary judgment, Fed. R. Civ. P. 56(e) requires that affidavits be based on personal knowledge and admissible evidence. Fed. R. Civ. P. 56(e). Mere conclusory allegations, speculation or conjecture, however, will not avail a party resisting summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

*There Are No Genuine Material Issues of Fact With Respect to the Origin of the Funds*

The government moved for summary judgment on the grounds that, based on the admissible evidence, there are no genuine material issues of fact regarding whether the defendant funds are property involved in and proceeds traceable to transactions or attempted transactions in violation of 18 U.S.C. §§ 981, 1956 (money laundering), and proceeds traceable to violations of 21 U.S.C. § 841 et seq. (controlled substances) and are therefore subject to seizure and forfeiture under 18 U.S.C. §§ 981 and 21 U.S.C. § 881. For the reasons set forth below, the court grants the government's motion in its entirety.

In order for property to be forfeitable under 18 U.S.C. § 981, the government must show, by a preponderance of the evidence, that the defendant funds are traceable to (1) an actual or attempted financial transaction, (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) either (a) an intent to promote the carrying on of specified unlawful activity, or (b) knowledge that the transaction is designed to promote the underlying specified unlawful activity or "to conceal or disguise the nature [or] the source . . . of the proceeds of specified unlawful activity." *See United States v. Maher,* 108 F.3d 1513, 1525 (2d Cir. 1997); 18 U.S.C. § 1956. Here, the government has met every element.

With respect to Cardona's knowledge that the money transactions involved proceeds from

narcotics transactions, it is only necessary that Cardona "knew of the transaction's obfuscatory purpose." *Maher*, 108 F.3d at 1526. Here, the evidence indicates that Cardona had accumulated the defendant funds and his job was to redistribute them to other people, per the instructions of Andreas and Hernan Botero and Alzate, their mother. This fact pattern indicates that Cardona knew, or should have known, that the transactions he engaged in were designed to obscure the true source and ownership of the funds. *See United States v. Szur*, 289 F.3d 200, 219 (2d Cir 2002). No reasonable jury could conclude that Cardona was unaware of an "obfuscatory purpose" to his moving hundreds of thousands of dollars around in duffle bags.

Moreover, the government intercepted conversations between Cardona and Andreas, another known money launderer and subject of the investigation, related to attempts to transfer an additional $470,000. Later, $400,000 was recovered from a bag in Cardona's apartment, Thus, the government has satisfied the first element. The $80,000 Cardona delivered to Giraldo were neatly wrapped, with "80" written in magic marker on tape fastening the funds. Cardona even admitted wrapping the funds in that manner. Cardona was caught with $50,000 wrapped similarly, neatly in a plastic bag, with "50" written in magic marker on tape fastening the funds. In Cardona's home, MLU officers discovered a list with various names and numbers. One of the names on the list is "Wilson." Corresponding to that name is the number "80." Also on the list is the telephone number 917-861-7003, the number of a known money launderer who was the subject of the investigation that led MLU officers to Cardona. Cardona has admitted that he wrote this list.

Cardona attempts to create an issue of fact by boldly denying that he was involved in money laundering activities. However, a review of Cardona's spending and banking habits further supports the government's position that there is no plausible legitimate justification for Cardona's hoarding

over half a million dollars in his apartment. Cardona alleges that he was hoarding hundreds of thousands of dollars in his home and then making small loans to members of the Colombian community. Cardona claims the notes with the phone numbers and corresponding amounts were simply a means for him to remember the amounts he had lent and to whom. Cardona failed to demonstrate that the funds had a legitimate source. Cardona failed to report any income (or loss) from this business to the Internal Revenue Service. Against the overwhelming evidence presented by the government, Cardona's denials and contradictory explanations cannot create a genuine issue of material fact as to the source of the funds. Cardona's version of events is undeniably contradicted by the record and cannot be accepted by this court. *Scott v. Harris*, *supra.* There is no genuine issue of fact with respect to any element necessary to show forfeitability pursuant to 18 U.S.C. § 981.

Because there is no plausible legitimate source of the funds, the court grants summary judgment in favor of the government. *See United States v. 228 Acres of Land and Dwelling Located on White Hills Rd. in Chester. Vt.,* 916 F.2d 808, 813 (2d Cir. 1990) (holding that district court correctly inferred that forfeited properties were traceable to drug activity where, when combined with other factors, claimant failed to offer any bills, receipts, or other records to prove the named businesses were capable of generating large sums of cash); *United States v. 785 St. Nicholas Ave.*, 983 F.2d 396, 403 (2d Cir. 1993) ("[t]he failure to account for large amounts of cash may be considered a factor in establishing probable cause that money represents the proceeds of drug transactions.").

The government alternatively argues that it is entitled to forfeit the funds because the funds were involved in the commission of a criminal offense, i.e., the distribution of controlled substances. To establish that it is entitled to forfeiture on these grounds, the government must establish by a

preponderance of the evidence that there is a nexus between the funds and the offense. 18 U.S.C. § 983(c)(3); *United States v. Daccarett*, 6 F.3d 37, 56 (2d Cir. 1993). The government is not required to link the funds to a particular transaction but instead may rely on circumstantial evidence to establish a nexus between the funds and illegal conduct. *Id*. at 57. As detailed above, the government's telephonic and physical surveillance of Andreas and Hernan Botero and Alzate that led the MLU officers to Cardona and defendant funds, demonstrates a nexus between the defendant funds and illegal activity. Andreas and Hernan were both indicted and convicted of money laundering. Mantell Decl. Exhibit 15. There are no genuine issues of material fact that these convicted money launderers were directing the collection and distribution of the funds with Cardona as a conduit.

Having demonstrated a nexus between the defendant funds and illegal activity, the burden shifts to the claimant to demonstrate by a preponderance of the evidence that the funds are traceable to a legitimate source. *See Daccerett*, 6 F.3d at 56; *United States v. U.S. Currency in the Amount of Forty Thousand Dollars ($40,000), More or Less*, 97 Cv 508, 1999 WL 1011938, *3 (E.D.N.Y. Sept. 22, 1999). The court has already detailed above Cardona's failure to prove that the defendant funds came from a legitimate source.

As such, the court finds that there are no genuine issues of material fact with respect to the government's contention that the defendant funds constitute proceeds of criminal activity and are thus forfeitable.

## CONCLUSION

For the reasons set forth above, Cardona's motion to suppress is granted as to certain post-arrest statements and is denied as to physical evidence seized from him and his home. Additionally,

plaintiff is awarded summary judgment as to Cardona's claim to the defendant *in rem*. Moreover, all other potential claimants to the defendant *in rem*, including all other persons known or thought to have an interest in or claim to the defendant *in rem*, having been given due notice of these proceedings, are hereby held to be in default pursuant to Fed. R. Civ. P. Supp. Rules A, C. The government is directed to submit an appropriate judgment to that effect within ten days of this court's order for the court's approval. The Clerk of the Court is directed to close the file maintained in this matter.

SO ORDERED

DATED: Brooklyn, New York
        September 13, 2007

                                 _____/s/_____
                                     DORA L. IRIZARRY
                               United States District Judge